**TRAVELERS CASUALTY & SURETY CO. (f/k/a The Aetna Casualty and Surety Co.), plaintiff,**

v.

**GERLING GLOBAL REINSURANCE CORP. OF AMERICA (f/k/a Constitution Reinsurance Corp.), Defendant.**

**No. 3:01CV872(JBA).**

United States District Court,
D. Connecticut.

Sept. 30, 2003.

Robert J. Bates, Jr., Mark G. Sheridan, Bates & Carey, Chicago, IL, Steven A.

Blair, Bryan Cave, London, England, Matthew C. Browndorf, Bryan Cave, New York City, Brian C. Fournier, Margaret E. Haering, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, Matthew Michael Hausman, Pullman & Comley, Bridgeport, CT, Karen Baldwin Kravietz, Susman, Duffy & Segaloff, New Haven, CT, Joseph M. Pastore, III, Brown Raysman Millstein Felder & Steiner, Hartford, CT, Timothy J. Pastore, Gayle N. Wolkenberg, Buchanan Ingersol, New York City, for Gerling Global Reinsurance Corp. of America.

Sheila M. Brodbeck, Kevin D. Lewis, Pamela B. Reichlin, Mary Kay Vyskocil, Simpson, Thacher & Barlett, New York City, Craig I. Lifland, Zeisler & Zeisler, P.C., Bridgeport, CT, Thomas F. Maxwell, Jr., Pullman & Comley, Bridgeport, CT, for Travelers Cas. & Surety Co.

*RULING on DEFENDANT'S MOTION for SUMMARY JUDGMENT [DOC. # 68]*

ARTERTON, District Judge.

In this diversity case, defendant Gerling Global Reinsurance Corporation of America ("Gerling") moves for summary judgment on the two count breach of contract complaint of plaintiff Travelers Casualty and Surety Company ("Travelers") brought in the context of a dispute over the scope of coverage of certain facultative reinsurance certificates issued by Gerling to Travelers.[1] This motion asks the Court to decide that monies paid under primary and excess insurance policies by Travelers

---

1. During much of the time period underlying the present litigation, Travelers was known as The Aetna Casualty and Surety Company and Gerling as Constitution Reinsurance Corporation. The Court will, however, refer throughout this opinion to each party by its current name (Travelers and Gerling), recognizing that such reference is at times anachronistic.

For discussion of the business of reinsurance, see *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1198–99 (3d Cir. 1995); *Unigard Sec. Ins. Co. Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1053–54 (2d Cir. 1993).

to Owens Corning Fiberglass ("OCF") in settlement of claims related to asbestos exposure require a multiple occurrence allocation as a matter of law under the definition of "occurrence" in the policies,[2] and that Gerling is not obligated to follow Travelers' single occurrence allocation under the "follow the fortunes" doctrine. Travelers' sole response is that the allocation was consistent with the settlement it reached with OCF, which in turn was based on a reasonable interpretation of the primary and excess policies, and therefore, under the doctrines known as "follow the fortunes" and "follow the settlements," Gerling as reinsurer must accept Travelers' interpretation (even if arguably erroneous) and cannot now re-litigate coverage disputes resolved in the settlement with OCF. For the reasons set forth below, Gerling's motion is GRANTED.

## I. Background

### A. The Contracts

OCF was a major distributor and/or manufacturer of an asbestos product known as Kaylo from 1953 to 1972. OCF also operated a separate contracting division that installed, maintained and removed Kaylo and asbestos products manufactured by other asbestos manufacturing companies.

From 1952 through 1979, Travelers insured OCF through primary and excess policies for bodily injury and/or property damage caused by an "occurrence," providing coverage for losses for hazards related to OCF's business, including products and completed operations hazards ("products coverage") and premises and operations hazards ("non-products coverage"). An "occurrence" was defined as,

an accident, including continuous or repeated exposure to conditions, which re-

sults in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Def.'s Ex. S at TR 08826. In addition, a section entitled "Limits of Liability" modified the understanding of "occurrence,"

For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* at TR 08825. Non-products coverage applied to injuries resulting from asbestos exposure during installation or removal of asbestos-containing products. Products coverage applied to asbestos exposure after asbestos-containing products had been placed into the stream of commerce, or after an asbestos-related operation was completed.

The primary and excess policies had both per occurrence and aggregate limits for products coverage, but, for non-products coverage, the policies had only occurrence limits. Thus, if a loss or losses involved multiple occurrences under the non-products coverage, Travelers could be liable for multiple sets of occurrence limits. The primary polices contained $1,000,000 per occurrence limits, and the excess policies contained $25,000,000 per occurrence limits. The total of the per occurrence limits for all of the primary and excess policies was $273.5 million.

In order to spread this risk on the OCF policies, Travelers purchased reinsurance protection from a variety of reinsurers, including Gerling. From October 22, 1975 to October 22, 1977, Gerling sold Travelers five facultative reinsurance certificates (the "Certificates"), under which Gerling agreed to reinsure Travelers for losses

---

**2.** The excess policies were the only ones reinsured by Gerling.

paid by Travelers to or on behalf of OCF under specified portions of excess liability insurance policies covering the period from 1975 to 1977.

The Certificates contain two relevant clauses: a mixed "follow the fortunes/forms" clause and a "follow the settlements clause," which respectively provide:

> The liability of [Gerling] shall follow that of [Travelers] and shall be subject in all respects to all the terms and conditions of [Traveler's] policy except when otherwise specifically provided herein. . . .

> All loss settlements made by [Travelers], provided they are within the terms and conditions of the original policy(ies) and within the terms and conditions of this Certificate of Reinsurance, shall be binding on [Gerling].

*E.g.* Pl.'s Ex. 3 at D002188.

### B. Asbestos Litigation in General

By the early 1980s, lawsuits alleging asbestos-related bodily injuries were pending in virtually every state. In response, several major insurers began to negotiate with representatives of the asbestos industry to resolve myriad coverage issues. The negotiations culminated in 1985 with the execution of an agreement commonly referred to as the "Wellington Agreement" (in reference to Dean Harry Wellington of Yale Law School) between dozens of asbestos producers, including OCF, and many large insurance companies, including Travelers. The Wellington Agreement imputed aggregate limits to the non-products coverage in the primary and excess policies issued to OCF by Travelers if incepting before September 1975, leaving non-products coverage in primary and excess policies issued after that date with no aggregate limits. The Wellington Agreement did not resolve the critical dispute catalyzing the present litigation, whether to treat non-products asbestos claims as one or multiple occurrences.

### C. OCF and Travelers

Beginning in the 1970s, OCF faced thousands of lawsuits for bodily injury caused by exposure to asbestos. Initially, Travelers and OCF treated OCF's asbestos liabilities as products claims under the policies issued to OCF. By the early 1990s, Travelers had paid OCF in excess of $400 million in indemnity and defense costs and had exhausted the policies' products coverage limits. OCF, however, then began to submit its asbestos bodily injury claims under the non-products coverage provisions of the policies, claiming that as much as eighty percent of its asbestos claims arose out of its contracting activities and were thus covered under the non-products premises/operations hazards provisions of the policies, which did not have aggregate limits but only limits per occurrence. Travelers disputed any additional coverage for these asbestos-related claims under the non-products provisions.

In March 1993, OCF commenced an alternative dispute resolution proceeding against Travelers seeking non-products coverage for its asbestos bodily injury claims. In October 1993, after the mediation phase of the proceedings, OCF moved for summary judgment at arbitration, seeking a declaration that Travelers was obligated under the non-products coverage of the OCF policies to defend and indemnify any asbestos claim that arose out of any exposure to asbestos fibers during OCF's contracting operations, and that each of the claims of asbestos exposure (or, at a minimum, each of the hundreds of job sites at which OCF conducted its contracting operations) was a separate occurrence each triggering a full set of occurrence limits, *see* Pl.'s Ex. 8 at 74–75.

Travelers vigorously opposed OCF's motion, arguing that all of OCF's asbestos claims, whether for products or non-products coverage, arose from a single occurrence,[3] and that OCF had not adequately documented its claim for non-products coverage. Because Travelers had already paid one set of occurrence limits in connection with OCF's products claims, it argued that OCF was not entitled to any further coverage. Travelers argued that a win for OCF on its multiple-occurrence argument would result in essentially unlimited coverage for OCF's asbestos exposure.

OCF and Travelers waited almost two years with no decision from the arbitrator on OCF's motion. As time passed, Travelers came to believe that the lengthy delay indicated that neither side would win a complete victory. Mr. O.J. "Tim" Walker ("Walker"), National Account Manager for Travelers who had handled OCF's asbestos claims since 1978, explained:

> It was taking so long that I guess the concept that was being coined within was these issues were so big and so complex, and there was so much money involved—for example, our one-occurrence approach, and you've already spent those limits—is a zero.... [W]e pretty much knew that the asbestos problem for Owens Corning was in the ballpark of maybe about $10 billion. So our concern was the judge was struggling with, you know, zero here, and some percentage of 10 billion here. So, so we had so much financially at stake

that we—the phrase was coined that we thought what [the arbitrator] would do was split the baby.... We didn't think he would shut them out with the big zero, and we didn't think he would sock it to us with the 80 percent non-products they were seeking, but he would find some way to split the baby. So in that context, Travelers decided that they would rather return to a negotiating table than to sit back and wait for a decision.

Pl.'s Ex. 2 at 204:13–206:9. According to Walker, Travelers believed the most logical manner in which the arbitrator would split the baby was to award OCF one set of occurrence limits for non-products claims in addition to the occurrence limit already paid out for OCF's product claims. Walker testified:

> Q. When you went into that meeting, did you have a target range in terms of dollars? I think you said you were trying to get away from percentages. Did you have a target range for the dollars?
>
> A. Well, I mean, you know, our threshold range was to keep it within the occurrence limits. I mean, that was our threshold range. Of course we didn't go in and offer that much. We went in and offered somewhat less than that. I think for—what I came away with that meeting was that if— at the end of the negotiating, if we could settle this case for occurrence

---

**3.** *See e.g.,* Pl.'s Ex. 11 at 7 ("The case law, including most importantly Ohio law, overwhelmingly supports [Travelers'] single-occurrence position, and refutes OCF's assertion that each claim (or each job) constitutes a separate occurrence under the policies within the context of asbestos claims."), 73 ("In the context of asbestos claims, it is now settled law in Ohio and elsewhere that the [per occurrence] limit applies to all bodily injury arising out of exposure to a policyholder's asbestos activities."), and 76–80; Pl.'s Ex. 2 at 179:20–180:5; Pl.'s Ex. 19; Def.'s Ex. S at 15 ("Yet OCF maintains that the same coverage limits are magically transformed into multiple occurrences limits when OCF takes the next step in the chain of distribution and installs an asbestos-containing product. In that instance, OCF incorrectly maintains, each OCF contracting job constitutes a separate occurrence for all bodily injury claims that arise from that job.") and 21–23.

limits or less, we would do so. No one gave me that authority, I didn't have that authority, but I'm just telling you that's the way the discussions sort of came out, sort of became the threshold.

Q. And what was the basis for targeting, you know, one set of occurrence limits for non-products in the settlement negotiations?

A. Well, again, we thought that ... would—that the judge could split the baby, and that would be the most logical split on the limits issue.

Pl.'s Ex. 2 at 234:6–235:8; *see also id.* at 526:19–22 (testimony of Travelers' CFO Michael Borom ("Borom")) ("Well we thought if we brought it under 300 [million], we'd be doing well. It was, in essence, a single occurrence when it was around 300 [million], and we were going to get it under that."). Based on the counteroffer of OCF, an amount equal to roughly the net present value of one set of occurrences plus defense costs, Walker believed OCF was approaching settlement on the same basis as Travelers.

The settlement negotiations culminated in the execution of an agreement in September of 1995 dismissing the arbitration with no ruling on OCF's summary judgment motion and obligating Travelers to pay roughly 273.5 million over several years for asbestos-related claims and environmental claims under OCF's primary and excess policies.[4] The settlement agreement did not purport to set forth the allocation of the settlement payments to any of the multiple occurrences claimed by OCF, and instead explicitly disclaimed any particular theory of coverage:

The parties unconditionally enter into the following mutual release:

OCF completely and forever release[s] ... Aetna ... from ... claims ... arising out of or in any way relating to (I) Asbestos Claims....

'Asbestos Claims' means any and all ... claims ... where such claim ... arises out of, involves or relates in any way to asbestos or asbestos containing products ... regardless of (I) the cause of action or theory of recovery employed by the person asserting or pursuing such claim ... (ii) the point in time in the past, present or future at which the cause of action underlying such claim, action, lawsuit or proceeding accrues, or (iii) the theory of coverage employed by OCF or such person with respect thereto ....

Def.'s Ex. V at D000102.

Travelers ultimately allocated the vast majority of its cash payments to OCF as a single occurrence of non-products claims,[5] using each policy's occurrence limit as the applicable indemnity limit, and further allocating some of the initial cash payments as defense costs. Based on the methodology adopted in *Colt Indus., Inc. v. Aetna Cas. & Sur. Co.*, 1991 WL 97702 (E.D.Pa. May 30, 1991), Travelers allocated the settlement payments to the OCF policies by spreading the settlement amount evenly among policy years on a single-occurrence basis. According to Travelers, this allocation method was selected and performed without regard for reinsurance recovery or substantive knowledge of Travelers' reinsurance program.

Prior to and throughout the arbitration with OCF, Travelers provided Gerling with updates on the status of the dispute. On July 27, 1995, it notified its reinsurers,

---

**4.** The 1995 settlement actually had three different parts, the third of which was commuted in 1999. The details of the complex settlement are not relevant to the present opinion.

**5.** The portion not allocated to non-products claims is not at issue in this case.

including Gerling, that it had entered into settlement negotiations with OCF, stating:

> Please be advised that representative[s] from Aetna and OCF have met to initiate settlement discussions. OCF's initial demand amounted to 40% of prospective expense and 15% of indemnity on a going forward basis. This translates into an approximately $400,000,000 payout over the next ten years from Aetna. OCF later indicated that $300,000,000 may be an acceptable amount to settle the claims. Aetna's management is considering how they will respond to OCF.

*See* Pl.'s Ex. 21. Gerling did not invoke its right under the Certificates to associate with Travelers in handling its claims with OCF. On September 14, 1995, Travelers informed Gerling and its other reinsurers that it had entered a settlement with OCF. On November 18, 1996, ten months prior to the date the first settlement payment to OCF was due, Travelers notified Gerling of the single occurrence allocation methodology Travelers had used to allocate the settlement payouts to the policies it had issued to OCF. Gerling's questioning and deferral of Travelers' subsequently submitted bills under the Certificates (for reinsurance of a portion of the settlement payments) prompted meetings and correspondence between Travelers and Gerling regarding the settlement and allocation of settlement payments, and ultimately the present litigation. Throughout the dispute with Travelers, Gerling's consistent objection has been the use of a single occurrence theory for allocating the settlement payments.[6] During discovery in a related arbitration proceeding,[7] Travelers produced a report furnished to it by OCF in the underlying arbitration in support of OCF's (and now Gerling's multiple occurrence theory), purporting to list OCF's contracting asbestos jobs at over seven hundred job sites across the United States during the period beginning in 1953 and ending predominately in the 1970s but as late as the early 1990s.

## II. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Procedurally, Rule 56 places the initial burden of production of evidence on the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c) and (e)). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material

---

**6.** Other than the use of a single occurrence theory, however, Gerling accepted the other parts of Walker's allocation methodology. *See* Mem. in Supp. at 13.

**7.** While the arbitration proceeding concerned Travelers' claims under facultative reinsurance contracts issued to Travelers by Gerling and the present litigation concerns claims submitted under facultative reinsurance contracts issued to Travelers by Constitution Reinsurance Corporation, *see supra* note 1, the underlying claims were/are exactly the same. However, the arbitration proceeding is subject to a confidential agreement and, with the exception of some of the discovery produced therein, has not been disclosed to the Court.

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The District Court then determines whether to grant summary judgment, with the understanding that "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Discussion

### A. Parties' Arguments

#### 1. Gerling's Motion for Summary Judgment

Gerling's motion claims entitlement to summary judgment on the basis of four facts: i) Travelers settled with OCF for claims arising from OCF's non-products asbestos liability for contracting operations at over seven hundred job sites; ii) Travelers allocated roughly $257 million of the settlement to non-products claims; iii) Travelers allocated the settlement payments to OCF's primary and excess policies on a single occurrence basis; and iv) the definition of occurrence in the primary and excess OCF policies directs a conclusion that each of the seven hundred job sites be treated as a separate and distinct occurrence. *See* Mem. in Supp. at 18. Gerling argues that the allocation of the settlement payments to OCF must be made in accordance with the policies' definition of occurrence, that is, on a multiple occurrence theory, and that, when so allocated, the settlement payments never reach OCF's excess policies, for which the Certificates provide reinsurance.

Gerling argues that each asbestos job performed by OCF involved different sets of workers, job conditions, buildings, and possibly different products. Thus, continues Gerling, OCF received multiple claims from workers or other affected individuals claiming injury from these different contracting operations. As the job sites totaled over seven hundred, the definition of occurrence in the policies dictates a conclusion of over seven hundred occurrences. In support of its interpretation, Gerling cites *In re Prudential Lines Inc.*, 158 F.3d 65 (2d Cir.1998), *Stonewall Ins. Co. v. Asbestos Claims Mgmt.*, 73 F.3d 1178 (2d Cir.1995), *modified on denial of reh'g* 85 F.3d 49 (1996), *Metropolitan Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. 295, 765 A.2d 891 (2001), and *Travelers Cas. and Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 734 N.Y.S.2d 531, 760 N.E.2d 319 (2001).[8]

#### 2. Travelers' Opposition

Travelers argues that, under the "follow the fortunes" doctrine requiring "the reinsurer to follow the fortunes or be placed in the position of the insurer,"[9] Gerling must follow Travelers' allocation of the settlement payments to OCF, summarizing its argument as follows:

**8.** Gerling proposes that, assuming the settlement payments are required to be allocated among OCF's primary and excess policies on a multiple theory basis, the Court should divide the sum of the settlement ($273 million) and the minimum number of occurrences, i.e. seven hundred job sites, by each of the 26 years OCF's policies were in effect, resulting in an allocation of $10.5 million and twenty-seven occurrences per policy year. Within each year, according to Gerling, the Court

should thus calculate an allocation of $404,000 per occurrence per year, an amount, Gerling suggests, is too small to even reach the per occurrence limits of $1,000,000 in OCF's primary policies for the years under review in the present litigation.

**9.** *Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co.*, 903 F.2d 910, 912 (2d Cir.1990).

The issue before this Court is *not* whether OCF's non-products asbestos liabilities arose from one or more occurrences—that issue was compromised in the settlement of Travelers Casualty/OCF dispute. Rather, the only issue before this Court is whether Travelers Casualty's settlement of the number of occurrences issue with OCF and subsequent allocation of the payments under that settlement on a one-occurrence basis was *reasonable under the circumstances*. Although there are any number of possible methods for allocating the $256 million settlement to the dozens of policies issued to OCF by Travelers Casualty over two decades, Travelers Casualty's allocation clearly satisfies the follow the fortunes' "reasonableness" standard because it is consistent with (i) Travelers Casualty's position in the underlying alternative dispute resolution proceeding, (ii) the manner in which the dispute with OCF was settled, and (iii) the prevailing case law addressing the critical coverage dispute between Travelers Casualty and OCF. Gerling is not entitled to substitute its own allocation method in order to eliminate its obligation to Travelers Casualty.

Pl.'s Opp'n at 4–5. Acknowledging that there is more than one way to allocate a loss, Travelers urges that, under the follow the fortunes doctrine, Gerling must accept Travelers allocation as long as it was reasonable in 1995 and not executed in bad faith.

To demonstrate reasonableness in its allocation, Travelers points out that the single occurrence allocation was consistent with the amount of the settlement (an amount less than one set of additional occurrence limits for non-products claims), and the manner in which the OCF non-products claims were settled (including Travelers' settlement strategy, which represented a compromise between Travelers' one occurrence position for all asbestos bodily injury claims and OCF's one occurrence per claimant/job site argument, and OCF's apparent strategy, demonstrated by its demands and counterdemands within the range of one additional set of occurrence limits), and the single occurrence methodology for OCF's products claims prior to the early 1990s for purposes of construing the policy deductible.

Travelers emphasizes that the case law existing at the time of the 1995 settlement agreement bolsters the claim that the allocation was reasonable, citing several cases concurring with the single-occurrence approach in the context of asbestos claims, including two cases specifically involving OCF asbestos losses, *Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F.Supp. 917, 923 (S.D.Ohio 1994) and *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 762 F.Supp. 566, 595 (S.D.N.Y.1991) *aff'd in part and rev'd in part on other grounds*, 4 F.3d 1049 (2d Cir.1993). Thus, it contends that the contrary post–1995 cases on which Gerling relies are irrelevant to evaluation of the reasonableness of settlement with OCF.

Travelers warns, "[i]f this Court were to pay any heed to Gerling's multiple-occurrence argument (raised at the reinsurance level, well after the settlement was executed and payments thereunder made and allocated), this Court would be inviting other reinsurers to propose different allocation methods that each reinsurer views to be most favorable to it." Pl.'s Opp'n at 22.

### 3. Gerling's Reply

Gerling attacks Travlers' invocation of the follow the fortunes doctrine and Travelers' heavy reliance on the application of the doctrine found in two cases, *North*

*River Ins. Co. v. ACE Am. Reinsurance Co.*, 2002 WL 506682 (S.D.N.Y. March 29, 2002) [10] and *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F.Supp.2d 49, 68 (D.Mass.1998) *aff'd on other grounds* 217 F.3d 33 (1st Cir.2000). Gerling contends that Travelers' decision to allocate as many settlement dollars as possible to OCF's excess policies (some of which were reinsured by Gerling) and as little as possible to OCF's primary policies (which were not reinsured by Gerling) was a unilateral decision made in preparing its reinsurance submission to Gerling and not in the context of negotiating a settlement to the arbitration with OCF. Gerling points out (and Travelers has admitted) that, in the arbitration, neither Travelers nor OCF advocated that OCF's non-product asbestos liabilities arose out of a single non-product occurrence. OCF argued that asbestos exposure of each underlying claimant or at each job site constituted separate occurrences, and Travelers argued that all OCF's asbestos liabilities, whether products or non-products, arose out of a single occurrence, therefore leaving no further insurance to OCF as Travelers had already paid out the per occurrence limits of OCF's policies. Gerling then draws the conclusion that, if the arbitrator had adopted the view of either OCF or Travelers, there would have been no liability assigned to the excess OCF policies at issue in the present case. While Gerling is correct as to the adoption of Travelers' position, the record provides no basis for determining if the adoption of OCF's position would have led to an allocation of greater than one million dollars to any one occurrence and thus potentially triggered liability under some of the excess policies at issue in the present case.[11]

In support of the contention that the actual settlement with OCF was not driven by a single occurrence theory, Gerling points to 1) testimony of Walker to the effect that the ostensible settlement was focused on monetary amounts and not occurrences;[12] 2) an internal Travelers memorandum contemporaneous with the settlement discussions with OCF that focuses extensively on the bottom line monetary analysis of the settlement with no mention of the occurrence issue, *see* Pl.'s Ex. 11; 3) the tension between Travelers' allocation based on a one occurrence theory and its admission that it settled with OCF by paying an additional set of occurrence limits over the set it had already paid; 4) Borom's testimony that Travelers' goal in settlement was to minimize the amount of dollars paid out, *see* Pl.'s Ex. 2 at 532:2–24; 5) Walker's testimony that Travelers and OCF never reached agreement on the number of occurrences issue;[13] and 6) the absence of an allocation

---

**10.** *North River* is currently on appeal before the Second Circuit Court of Appeals (oral argument was held on March 29, 2002).

**11.** This is why the Court has no basis for adopting or rejecting the allocation formula proposed by Gerling. *See supra* note 8.

**12.** Q. I appreciate that, Mr. Walker, but I asked you the question as to whether or not this settlement was, in fact, driven on dollars and cents; it was not driven on how many occurrences.

 A. It was driven on dollars and cents and we did sit down and discuss occurrences with them. They wanted dollars. They didn't care, quite frankly, how we called it, as long as they got the dollars. But we were going to keep this one within our occurrence limits, which we did.

Def.'s Reply Ex. 2 at 326:23–327:9.

**13.** A. No, no. We never reached an agreement with Owens–Corning, sir. We argued one occurrence and alternative one-occurrence, separate occurrence for nonproducts. We never reached agreement. We used that argument to drive down the settlement. We never reached agreement with Owens–Corning at all. I allocated on one occurrence

in the settlement agreement between Travelers and OCF, *see* Def.'s Ex. V.

In addition to arguing that the follow the fortunes doctrine does not apply, Gerling also urges that, even if it does, the allocation of Travelers falls squarely within an exception to the doctrine because it violates the terms of the reinsurance contracts. In support, Gerling relies on *Metropolitan Life, Lloyd's, Prudential Lines*, and *Stonewall*, to demonstrate that the definition of occurrence in the Certificates (incorporated by reference from OCF's underlying policies) unambiguously requires a multiple-occurrence conclusion where, as here, OCF's non-product asbestos operations were conducted at seven hundred different locations scattered across the country over a period of more than forty years.

## B. "Follow the Fortunes"/"Follow the Settlements" Doctrine Does Not Apply

■ The Court concludes that, under the facts of this case, Gerling is not bound by Travelers' allocation of its settlement payments to OCF among the various primary and excess insurance policies it issued to OCF. Gerling's multiple occurrence position does not challenge Travelers' allocation by advancing a coverage position which Travelers did not press when deciding to settle the arbitration with OCF. Instead, Gerling's position mirrors OCF's arbitration position. Its position of policy interpretation, even if known by Travelers at the time of the OCF settlement, would thus not have disincentivized that settlement because it was not the position Travelers was advancing against OCF. The record evidence of Travelers' and OCF's settlement demonstrates that Travelers wanted to extract itself from the coverage dispute with OCF for as little dollar exposure as possible, however achieved, and OCF and Travelers came to a settlement without any agreement on the occurrence issue. Put simply, by refusing reinsurance coverage on the basis of Travelers' single occurrence allocation, Gerling is not punishing Travelers for not going to the mat with OCF on the single occurrence position it advanced—a situation which the follow the fortunes doctrine was promulgated to prevent.

■ "The purpose of the follow the settlements doctrine is to prevent the reinsurer from 'second-guessing' the settlement decisions of the ceding company. Absent such a rule, an insurance company would be obliged to litigate coverage disputes with its insured before paying any claims, lest it first settle and pay a claim, only to risk losing the benefit of reinsurance coverage when the reinsurer raises in court the same policy defenses that the original insurer might have raised against its insured." *Aetna Cas. and Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1328, 1346 (S.D.N.Y. 1995); *see also North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1204 (3d Cir.1995)(" 'Follow the fortunes' forecloses relitigation of coverage disputes because when an insurer disclaims coverage its interests are generally aligned with those of its reinsurer. Permitting reinsurers to revisit coverage issues would place insurers in an untenable position. Inevitably, defenses insurers advanced in coverage contests would be used against them by reinsurers seeking to deny coverage."); *Int'l Surplus Lines Ins. Co. v. Certain*

---

because that's what we negotiated from is the occurrence. That is what caused, in my opinion, that is what caused Owens–Corning to settle this case as cheaply as they settled the case, was their fear that the judge was going to rule no occurrences; or in the alternative, one occurrence for nonproducts.

*Underwriters & Underwriting Syndicates at Lloyd's of London,* 868 F.Supp. 917, 921 (S.D.Ohio 1994)("Were the Court to conduct a de novo review of [the insurer's] decision-making process, the foundation of the cedent-reinsurer relationship would be forever damaged. The goals of maximum coverage and settlement that have been long established would give way to a proliferation of litigation. Cedents faced with de novo review of their claims determinations would ultimately litigate every coverage issue before making any attempt at settlement.").

The "follow the fortunes" doctrine contractually obligates a reinsurer to indemnify the ceding company's payments made under a loss settlement reasonably within the terms of its own policy "even if technically not covered by it," *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.,* 979 F.2d 268, 280 (2d Cir.1992), "provided that such settlement is not fraudulent, collusive or otherwise made in bad faith, and provided further that the settlement is not an *ex gratia* payment." *Aetna,* 882 F.Supp. at 1346. However, "a reinsurer is not obligated to indemnify for payments clearly beyond the scope of the original policy or in excess of its agreed-to-exposure." *Christiania,* 979 F.2d at 280; *see e.g., Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co.,* 903 F.2d 910 (2d Cir.1990) (reinsurer not liable for cedent's settlement agreement to pay defense expenses and costs where such costs and expenses exceeded the express cap on liability contained in reinsurance certificate).

The rationale for invoking the doctrine and binding the reinsurer applies where not doing so would discourage the cedent from good faith settlement with its insured. In other words, the reinsurer is not permitted to tell the cedent it should not have relinquished or "abandoned" its coverage or litigation position by the fact of its settlement. *See American Bankers Ins. Co. of Florida v. Northwestern Nat'l Ins. Co.,* 198 F.3d 1332, 1336–37 (11th Cir.1999)(reinsurer's reasonable acceptance of cedent's acquiescence in insured's single occurrence theory may not be challenged by reinsurer's reinsurer on grounds that reinsurer should have contended that claims against insured submitted to cedent constituted multiple occurrences); *Aetna,* 882 F.Supp. 1328 (reinsurer not permitted to contest reinsurance obligation on the grounds that liability limit in underlying insurance contracts was cost-inclusive where cedent reasonably abandoned that position to settle with its insured, which had taken the position that the contracts were cost-supplemental); *International Surplus Lines,* 868 F.Supp. 917 (reinsurers bound to follow cedent's reasonable and good faith acceptance of insured Owens Corning's position that asbestos claims against it arose from one occurrence—the decision to manufacture and sell products containing asbestos—and not permitted to argue that cedent should have maintained a multiple occurrence position).

By contrast, the salutary purpose of the doctrine has no application to a reinsurer's coverage challenge where the cedent's allocation is based on a position the cedent earlier abandoned in order to settle with the insured. In such a situation, the reinsurer is placing itself in the position of the cedent, that is, following the cedent's settlement.

Here, the Certificates require Gerling to follow Travelers' settlement with OCF: "All loss settlements made by [Travelers], provided they are within the terms and conditions of the original policy(/ies) and within the terms and conditions of this Certificate of Reinsurance, shall be binding on [Gerling]." *E.g.,* Pl.'s Ex. 3 at D002188. Travelers and OCF had advanced polar opposite positions in the arbi-

tration creating a situation in which a victory for one meant total defeat for the other. The fact that Travelers settled with OCF for $273.5 million (or for any sum at all), while not an endorsement of OCF's multiple occurrences theory, objectively establishes that Travelers did not persevere in the one occurrence theory of its subsequent allocation. The testimony of Walker and Borom about their subjective intent in settling OCF's claims does not change this conclusion. Both admit that the settlement was approached along the lines of paying out a sum that was within one additional set of occurrence limits for non-products claims, that is, adding to the one set of occurrence limits already paid out for OCF's products claims another set of occurrence limits to be paid for OCF's non-products claims. Such admission must be construed at least as a failure to persist in its one occurrence coverage defense and some movement toward the multiple occurrence position taken by OCF, given that Travelers had characterized dichotomization between one occurrence for products claims and one occurrence or occurrences for non-products claims as "utterly irrelevant to the application of the single limits requirement." Def.'s Ex. S at 23 (Travelers' Statement of Facts, Issues, and Relief Requested (in opposition to summary judgment against OCF)); see also id. (" . . . for purposes of principled jurisprudence interpreting and applying the limits of liability clauses of the insurance contract, however, there is no pertinent difference between the acts of 'installation,' 'sale' or 'delivery' that would alter the courts' single occurrence rationale or result.").

Further, the record of Travelers' and OCF's own dealings is consistent with the conclusion that the resolution of the number of occurrences issue was not necessary to end their dispute. Walker admitted that, while Travelers wanted to discuss the occurrence issue in settlement, OCF did not care about it, only the bottom line dollar figure, see supra note 12, and that he allocated based on one occurrence because that was Travelers' subjective settlement position, see supra note 13. The settlement agreement itself is silent as to the allocation of the settlement payment and disclaims any particular coverage theory. The fact that the amount of the settlement roughly approximates an additional set of occurrence limits is not sufficient evidence from which a jury could conclude that OCF and Travelers negotiated the settlement on the basis of a one occurrence theory for non-products claims, especially in light of the language of the release and Walker's admissions that OCF and Travelers never came to agreement on the occurrence issue and OCF did not care about anything more than the bottom line. Forcing Gerling to follow an allocation based on a single occurrence theory OCF opposed and did not accept in settlement would be tantamount to binding Gerling to any allocation theory Travelers professed they alone followed.

Under these circumstances, holding Gerling to Travelers' allocation does not promote the goal of the "follow the settlements" doctrine to incentivize settlement and reduce litigation because Travelers is not being told that it should not have settled on any basis other than its single occurrence position. In fact, to the extent Travelers would not have settled with OCF had it known Gerling would later reject a single occurrence allocation theory, such situation would evince bad faith on Travelers' part because Travelers would have held out on an issue regarding which OCF did not require resolution merely to gain greater reinsurance coverage, a practice which is an explicit exception to the "follow the fortunes" doctrine.

Travelers relies on *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,* 9 F.Supp.2d 49, 67–68 (D.Mass.1998) and *North River Ins. Co. v. ACE Am. Reinsurance Co.,* No. 00 CIV 7993, 2002 WL 506682 (S.D.N.Y. March 29, 2002). However, the reinsurer in *Commercial Union* in large part sought improperly to hold the cedent accountable for giving in on coverage issues. Here, Gerling does not fault Travelers for failing to persist with its single occurrence theory. The decision in *North River,* 2002 WL 506682, in turn is based solely on the reasoning of *Commercial Union, see North River,* 2002 WL 506682 at *3 ("While not binding on this Court, the above-quoted language [from *Commercial Union* ] makes perfect sense and will here be followed...."), and does not otherwise provide sufficient factual background for the Court to determine whether it differs in any significant respect from that of *Commercial Union* so as to affect the Court's analysis above.

### C. Travelers' Opposition

Travelers only response to Gerling's motion is to proffer a legal argument, by which it attempts to demonstrate triable issues on its breach of contract claims through Gerling's failure to acquiesce in Travelers' allocation, and disregards as irrelevant what a de novo interpretation of the Certificates (incorporating the underlying OCF policies) would mandate on the issue of number of occurrences. This choice of Travelers must be deemed a conscious strategic decision in light of the caselaw presented by Gerling showing the growing body of decisions that weigh against a one occurrence position as a valid interpretation of analogous (and in some cases identical) contracts in analogous factual situations, *see In re Prudential Lines Inc.,* 158 F.3d 65 (2d Cir.1998), *Stonewall Ins. Co. v. Asbestos Claims Mgmt.,* 73 F.3d 1178 (2d Cir.1995), *modified on deni-*

*al of reh'g* 85 F.3d 49 (1996), *Metropolitan Life Ins. Co. v. Aetna Cas. and Sur. Co.,* 255 Conn. 295, 765 A.2d 891 (2001), and *Travelers Cas. and Sur. Co. v. Certain Underwriters at Lloyd's of London,* 96 N.Y.2d 583, 734 N.Y.S.2d 531, 760 N.E.2d 319 (2001). Travelers' Local Rule 9(c)(2) Statement identifies only one genuine issue of material fact it claims for trial— whether Gerling acted in bad faith in refusing to follow Travelers' fortunes or settlements and pay Travelers' claims. Since the Court has rejected application of the follow the fortunes doctrine to the undisputed factual circumstances of this case, and Travelers has failed otherwise to designate specific facts showing Gerling's breach of contract or bad faith, summary judgment is appropriately entered for Gerling.

### IV. Conclusion

For the reasons set forth above, Gerling's motion for summary judgment [Doc. # 68] is GRANTED.

IT IS SO ORDERED.