96 N.Y.2d 583 (2001)
760 N.E.2d 319
734 N.Y.S.2d 531
TRAVELERS CASUALTY AND SURETY COMPANY, Formerly Known as AETNA CASUALTY AND SURETY COMPANY, Appellant,
v.
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON et al., Respondents, et al., Defendants.
TRAVELERS CASUALTY AND SURETY COMPANY, Formerly Known as AETNA CASUALTY AND SURETY COMPANY, Appellant,
v.
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON et al., Respondents, et al., Defendants.
Court of Appeals of the State of New York.
Argued September 5, 2001.
Decided October 16, 2001.
*584 Simpson Thacher & Bartlettt, New York City (Mary Kay Vyskocil, Joseph M. McLaughlin, Paul C. Gluckow, Michelle A. Kisloff and Tyler B. Robinson of counsel), for appellant in the first and second above-entitled actions.
*585 Wachtell, Lipton, Rosen & Katz, New York City (Herbert M. Wachtell, Michael W. Schwartz, Ben M. Germana and Israel Friedman of counsel), and Lord, Bissell & Brook (Robert B. Robinson, of the Illinois Bar, admitted pro hac vice, and Jill Van Wormer of counsel), for respondents in the first and second above-entitled actions.
*586 Cuyler Burk, L. L. P., New York City (Christopher Erd of counsel), and Bates & Carey, Chicago, Illinois (Robert J. Bates, Jr., and Mark G. Sheridan of counsel), for Reinsurance Association of America and another, amici curiae in the first and second above-entitled actions.
Rivkin Radler, L. L. P., Uniondale (William M. Savino, Stephen J. Smirti, Jr., and M. Paul Gorfinkel of counsel), for American Insurance Association, amicus curiae in the first and second above-entitled actions.
Anderson Kill & Olick, P. C., New York City (Eugene R. Anderson of counsel), for United Policyholders and others, amici curiae in the first and second above-entitled actions.
Cahill Gordon & Reindel, New York City (Edward P. *587 Krugman of counsel), and Eric S. Kobrick for American International Group, Inc., amicus curiae in the first and second above-entitled actions.
*598 Chief Judge KAYE and Judges SMITH, LEVINE, CIPARICK, WESLEY and ROSENBLATT concur.

OPINION OF THE COURT
GRAFFEO, J.
These appeals present a common issue of contract interpretation: whether losses from environmental injury claims involving decades of commercial activities at numerous industrial and waste disposal sites may properly be aggregated as a single "disaster and/or casualty" under certain reinsurance treaties. We conclude, under the facts and reinsurance contracts at issue, that the aggregation of these losses is beyond the scope of the applicable treaties.
We begin with a general explanation of the purpose and structure of reinsurance. As we described in Matter of Union Indem. Ins. Co., "[r]einsurance is `the insurance of one insurer (the "reinsured") by another insurer (the "reinsurer") by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public'" (89 NY2d 94, 105-106 [quoting Kramer, The Nature of Reinsurance, reprinted in Reinsurance, at 5 (Strain ed 1980)]; see also, Matter of Midland Ins. Co., 79 NY2d 253, 258; Sumitomo Mar. & Fire Ins. Co. v Cologne Reins. Co., 75 NY2d 295, 301; Staring, Reinsurance §§ 2:1-2:3, at 1-4 [1993]). When entering into a reinsurance contract, an insurance company agrees to pay a particular premium to a reinsurer in return for reimbursement of a portion of its potential financial exposure under certain direct insurance policies it has issued to its customers. Through this indemnity relationship, the reinsured seeks to "cede" or spread its risk of loss among one or more reinsurers. Reinsurance differs from direct insurance, such as excess insurance, in that the reinsurer is not, in most cases, directly obligated to the original insured; in fact, reinsurance indemnity does not arise until the reinsured has paid a claim.
Reinsurance comes primarily in two forms: facultative and treaty reinsurance. Facultative reinsurance is policy-specific, meaning that all or a portion of a reinsured's risk under a specific contract of direct coverage will be indemnified by the reinsurer in the event of loss. In contrast, a carrier seeking to reduce potential financial losses from policies issued to a class of customers or an industry may purchase treaty reinsurance (see, Staring, supra, § 2:3). "In a treaty reinsurance relationship, *588 there is `1) no individual risk scrutiny by the reinsurer, 2) obligatory acceptance by the reinsurer of covered business, and 3) a long-term relationship in which the reinsurer's profitability is expected, but measured and adjusted over an extended period of time'" (Union Indem., 89 NY2d, at 106 [quoting Clark, Facultative Reinsurance: Reinsuring Individual Policies, reprinted in Reinsurance, at 121 (Strain ed 1980)]).
Reinsurance can be structured to provide coverage in a number of ways. Two of the more common variations are quota share and excess of loss reinsurance (see, Staring, supra, §§ 2:4-2:5). "The characteristics of the quota share [reinsurance or proportional reinsurance] are that a reinsurer takes a given percentage of the risk of each underlying policy and also receives a certain percentage of the premiums charged, all within stated upper limits of liability" (id., § 2:4). In excess of loss reinsurance, also called non-proportional reinsurance, the reinsurer indemnifies "all or a percentage, usually high, of the excess of loss on the reinsured risks, above a stated amount, after the collection of any proportional reinsurance and up to a stated limit" (id., § 2:5). The "stated amount" or deductible is referred to as the "retention," above which the reinsurer is obligated to pay the reinsured's loss to the extent set forth in the contract (see, id.). Generally, the premiums for excess of loss reinsurance are lower than those for quota share reinsurance as the risks are not shared proportionately by the reinsured and reinsurer (see, Webb, The Pro Rata Property Treaty, reprinted in Reinsurance, at 72 [Strain ed 1997]). Here, it is undisputed that the various reinsurance contracts at issue are nonproportional, or excess of loss, reinsurance treaties.
Against this backdrop, we turn to the particular facts before us.

The Koppers Litigation
From 1960 to 1981, plaintiff Travelers Casualty and Surety Company[1] provided primary, excess and umbrella general liability insurance policies to the Koppers Company,[2] a chemical manufacturer that has operated in locations throughout the United States since the early 1900s. The primary policies issued *589 from 1960 to 1972 established varying property damage liability limits per occurrence while the excess policies for the years 1966 to 1972 limited coverage to $10 million per occurrence. Beginning in 1971, the primary policies contained "sudden and accidental" pollution exclusion clauses; a similar clause first appeared in the excess policies the following year.
During the period relevant to this appeal, Travelers purchased various types of reinsurance in connection with its policies issued to Koppers. In particular, Travelers purchased facultative reinsurance for 50% of the limits of its excess liability policies issued to Koppers from January 1, 1966 to March 1, 1972. In addition, it secured catastrophic excess of loss reinsurance from defendants, a number of foreign reinsurance companies,[3] for the years 1960 to 1970. These reinsurance treaties obligate the Reinsurers to pay Travelers for "each and every loss" incurred by Travelers that exceeds the retentions established under the treaties. The treaties define "each and every loss" as
"all loss arising out of any one disaster and/or casualty under coverage of any or all insureds of the Companies, or all loss under the products liability coverage of any one insured, or all loss arising out of the occupational disease hazard under Workmen's Compensation and Employers' Liability coverage of any one insured" (emphasis added).
In turn, the definition of "disaster and/or casualty" is described as
"each and every accident, occurrence and/or causative incident, it being further understood that all loss resulting from a series of accidents, occurrences and/or causative incidents having a common origin and/or being traceable to the same act, omission, error and/or mistake shall be considered as having resulted from a single accident, occurrence and/or causative incident."
The treaties also contain a so-called "follow the fortunes" clause which reads:
"Any and all payments made by [Travelers] in settlement of loss or losses under [its] policies, *590 whether in satisfaction of a judgment in any Court against the Insured or [Travelers] or made voluntarily by [Travelers] before judgment, in full settlement or as a compromise, shall be unconditionally binding upon the [Reinsurers] and amounts falling to the share of the [Reinsurers] shall be immediately payable to [Travelers] by [the Reinsurers] upon reasonable evidence of the amount paid by [Travelers] being presented * * *
"The [Reinsurers] agree to abide by the loss settlements of [Travelers], such settlements to be considered as satisfactory proofs of loss."
The underlying environmental claims at issue arose in the early 1980s when federal, state and local governments, as well as a number of private parties, commenced environmental actions directed at more than 150 of Koppers' plant and disposal sites throughout the country, many of which had been in operation for over 60 years.
In 1985, Koppers commenced an action in Federal District Court against Travelers and other insurers, including some of the defendants in this action in their capacity as direct insurers, seeking damages and a declaration that the insurers were obligated to defend and indemnify Koppers for its potential liabilities at these sites. Following a decade of litigation, Travelers eventually settled with Koppers for approximately $140 million. According to the parties' stipulation, the "settlement with Koppers resolved Travelers['] alleged liability to provide insurance coverage for pollution liability claims arising at more than 160 separate known sites throughout the United States, as well as at an undetermined number of unknown sites."[4]
Travelers then apportioned its $140 million settlement payment among the underlying direct insurance policies, treating each Koppers site as a separate occurrence. Subsequently, Travelers ceded approximately $61.5 million of this settlement to its facultative reinsurance policies. In determining how much of the settlement to allocate to the Reinsurers under the applicable reinsurance treaties, Travelers treated the entire settlement as a single "disaster and/or casualty" and appropriated the settlement monies correspondingly among the implicated treaties. Travelers' rationale was that the Koppers *591 loss resulted from a "common origin" and/or was "traceable to the same act, omission, error and/or mistake," namely, "Koppers' company-wide waste disposal practice." Based on this approach, the total amount Travelers ceded to the Reinsurers is approximately $13 million of the primary insured's claims, or about 9% of the total settlement.
After presenting its reinsurance claim to the Reinsurers, Travelers commenced the action underlying this appeal seeking money damages and declaratory relief.[5] Following extensive motion practice, the Reinsurers moved for summary judgment dismissing the claims in their entirety. In a cogent decision, Supreme Court dismissed the complaint on the ground that Travelers' allocation did not fall within the terms of the applicable reinsurance treaties. The Appellate Division unanimously affirmed (see, 277 AD2d 100), and this Court granted Travelers leave to appeal (see, 96 NY2d 706).

The DuPont Litigation
From 1967 to 1985, Travelers provided excess and umbrella liability insurance policies to E.I. DuPont de Nemours & Company, the largest chemical company in the world. Travelers then purchased reinsurance from various entities, including defendant Reinsurers. In particular, Travelers secured three catastrophic excess of loss treaties from the Reinsurers for the year 1967 to cover a "disaster and/or casualty" in excess of a $10 million retention. The relevant provisions in those treatiesincluding the definitions of "each and every loss," "disaster and/or casualty" and the "follow the fortunes" clauseare identical to the Koppers treaties.
In 1989, DuPont commenced litigation in Delaware against Travelers and other insurers seeking a declaration of insurance coverage for pollution-related claims arising from multiple hazardous waste sites. Travelers eventually paid DuPont $72.5 million in 1995 to settle insurance claims arising from pollution liabilities at those sites and then apportioned this settlement between two direct insurance policies with DuPont. Relevant to this appeal, $69 million was attributed to a 1967-1970 *592 umbrella policy, with 25 different sites identified as separate occurrences for allocation purposes.
Travelers thereafter sought reimbursement from its reinsurers, ceding over $34 million of the settlement to certain facultative reinsurance policies it had secured. After deducting this amount and its retention under the 1967 excess of loss reinsurance treaties, Travelers billed the Reinsurers approximately $7.4 million, or about 9% of the total settlement. As it did with the Koppers allocation, Travelers calculated this amount by treating the environmental contamination at the DuPont sites as a single loss. Specifically, Travelers averred that the polluted sites shared a "common origin," namely, a managerial failure by DuPont in the implementation and enforcement of its company-wide environmental policy.
Similar to the Koppers scenario, Travelers then sued the Reinsurers seeking monetary damages and declaratory relief. The Reinsurers answered and asserted a counterclaim for declaratory relief. The Reinsurers moved for summary judgment dismissing the complaint and for a declaration that they had no further obligation to Travelers with respect to the settlement of insurance claims with DuPont. Both parties asserted substantially the same arguments raised in the Koppers litigation.
Supreme Court granted the Reinsurers' motion dismissing the action against them and granted declaratory relief on their counterclaim. Noting that the language employed in the applicable reinsurance treaties was identical to that in the Koppers action, Supreme Court reiterated its reasons for rejecting the "single loss" aggregation theory as outside the terms of the reinsurance treaties. On appeal, the Appellate Division unanimously affirmed (see, 277 AD2d 100), relying on its holding in the Koppers appeal decided the same day. We granted Travelers' motion for leave to appeal (see, 96 NY2d 706).
We now affirm the orders of the Appellate Division in both actions.

Analysis
The parties' dispute centers on whether Travelers' single allocations of its losses are encompassed by the term "disaster and/or casualty," which includes "all loss resulting from a series of accidents, occurrences and/or causative incidents having a *593 common origin and/or being traceable to the same act, omission, error and/or mistake."[6]
The allocations made by Travelers in the Koppers and DuPont settlements for reinsurance purposes were premised on the theory that pollution at the various sites had a "common origin" or was "traceable to the same act, omission, error and/or mistake," namely Koppers' deficient corporate environmental policy and DuPont's failure to implement and enforce its environmental policy. In support of this argument, Travelers presents the common definition of "origin" as the "beginning, or derivation from a source" (Webster's Third New International Dictionary 1591 [1993]) and "traceable" as "capable of being traced * * * suitable or of a kind to be attributed" (id., at 2420). Thus, Travelers contends that the plain language of the treaties requires the "widest possible search for a unifying factor among the underlying claims."
In support of its proposition, Travelers relies primarily on Axa Reins. (UK) Plc v Field ([1996] 2 Lloyd's Rep 233 [UK HL, June 20, 1996]), a decision of the British House of Lords. In Axa, a reinsurer sought a declaration disallowing the aggregation of losses under a reinsurance policy. Although the reinsurer prevailed, Lord Mustill, writing for the House of Lords, observed a distinction between the use of the phrases "arising out of one event" and "arising from one originating cause" in the context of certain reinsurance agreements. He found the word "originating" implied a broader scope of application, requiring "the widest possible search for a unifying factor in the history of the losses which it is sought to aggregate" (id., at 239). Travelers urges that we adopt a similar view of the meaning of "common origin."[7] We note, however, *594 that the loss provisions discussed in Axa differ from those found in the treaties in this appeal.
In the Koppers and DuPont treaties, the terms "common origin" and "traceable to" are modified by the phrase "series of in the definition of "disaster and/or casualty." The word "series" is commonly defined as "a group of [usually] three or more things or events standing or succeeding in order and having a like relationship to each other: a spatial or temporal succession of persons or things" (Webster's Third New International Dictionary 2073 [1993] [emphasis added]). Our established precedent requires that in interpreting reinsurance policies, we give meaning to every sentence, clause and word of a contract of reinsurance (see, Northville Indus. Corp. v National Union Fire Ins. Co., 89 NY2d 621, 632-633). Simply reading the term "disaster and/or casualty" as Travelers urgesconducting the "widest possible search for a unifying factor among the underlying claims"would operate to excise the words "series of" from the language of the treaty in derogation of a basic principle of contract interpretation. We avoid this result by incorporating the inherent spatial or temporal boundaries of the phrase "series of" in interpreting the treaties.
Travelers responds that this construction renders the phrase "having a common origin and/or being traceable to the same act, omission, error and/or mistake" superfluous. To the contrary, the words may be read in harmony with the result that under the "disaster and/or casualty" provision, a reinsured could properly aggregate claims if those "accidents, occurrences and/or causative incidents" have a spatial or temporal relationship to one another and a "common origin." Where such a relationship is lacking, however, a reinsured cannot simply ignore the words "series of" and point to any event, however remote in place or time, that could possibly be considered of "common origin."
This construction further comports with the broad definition of "each and every loss," which sets forth the overall parameters of the reinsurer's liability. While coverage is extended to "all loss under the products liability coverage" and "all loss arising out of the occupational disease hazard under Workmen's Compensation and Employers' Liability coverage," the definition *595 of loss limits the third category to "any one disaster and/or casualty" (emphasis added). This limitation, coupled with the above discussion of "disaster and/or casualty," demonstrates that the parties did not intend for the reinsured to simply group together all other losses as a single "disaster and/or casualty," but sought to allow aggregation only where the losses are linked spatially or temporally and share a "common origin." Nonetheless, Travelers seeks to attribute events and losses separated spatially by thousands of miles and temporally by decades to a single "disaster and/or casualty."
A review of the pleadings, affidavits and exhibits submitted on the motions for summary judgment in these actions confirms that Supreme Court and the Appellate Division correctly held that there is no issue of material fact as to whether Travelers' single allocations of the Koppers and DuPont settlements are covered under the definition of loss in the reinsurance treaties. Neither complaint contains an allegation that the contaminated sites bear a spatial or temporal relationship to each other. In fact, the evidence demonstrates the opposite. In the Koppers litigation, the stipulation of facts reveals that the acts of pollution occurred over decades beginning in the 1920s at geographically diverse locations ranging from New Jersey to Oregon and involved dozens of different manufacturing processes and pollutants. The individual site summaries for each of the 160 locations, many prepared for Travelers during the underlying Koppers coverage litigation, are consistent with this conclusion as well. Similarly, the evidence in the DuPont litigation, including like site studies, reveals that the 25 sites where the losses were apportioned were also dispersed across the country and covered a multitude of commercial processes and contaminations spanning 100 years.
Under the allegations of the complaints and the records in these actions, we conclude as a matter of law that Travelers' single allocations of its settlements with Koppers and DuPont do not fall within the ambit of "disaster and/or casualty" in the reinsurance treaties. In light of the fact that, as Travelers concedes, the treatment of each site as a separate "disaster and/or casualty" fails to pierce any of the retention levels of the reinsurance treaties, summary judgment was properly granted in favor of the Reinsurers in both actions.[8]
Travelers makes an additional argument that deserves *596 discussion. Briefly stated, Travelers posits that the "follow the fortunes" clauses found in the reinsurance treaties mandate that the Reinsurers reimburse it for losses it allocates to them reasonably and in good faith.
The "follow the fortunes" doctrine provides that "a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it. A reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled" (Christiania Gen. Ins. Corp. v Great Am. Ins. Co., 979 F2d 268, 280 [2d Cir] [internal citation omitted]). The rationale behind this doctrine is two-fold: first, it meets the goal of maximizing coverage and settlement and second, it streamlines the reimbursement process and reduces litigation by preventing a reinsurer from continually challenging the propriety of a reinsured's settlement decision (see generally, International Surplus Lines Ins. Co. v Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F Supp 917, 921 [SD Ohio]).
While a "follow the fortunes" clause "in most reinsurance agreements leaves reinsurers little room to dispute the reinsured's conduct of the case" (Unigard Sec. Ins. Co. v North Riv. Ins. Co., 79 NY2d 576, 583), we agree with the rationale of the United States Court of Appeals for the Second Circuit that such a clause does not alter the terms or override the language of reinsurance policies. In Bellefonte Reins. Co. v Aetna Cas. & Sur. Co. (903 F2d 910 [2d Cir]), the Second Circuit considered whether reinsurers were obligated to the Aetna Casualty and Surety Company for an amount greater than the sums stated in the reinsurance certificates under the "follow the fortunes" doctrine. In holding that the reinsurers were not liable beyond the liability cap, the court held that "allowing the `follow the fortunes' clause to override the limitation on liability [] would strip the limitation clause and other conditions of all meaning; the reinsurer would be obliged merely to reimburse the insurer for any and all funds paid. Such a reading would be contrary to the parties' express agreement and to the settled law of contract interpretation" (id., at 913; see also, Christiania, 979 *597 F2d, at 280 [holding that a reinsurer is not obligated to indemnify for payments "in excess of its agreed-to exposure"]).[9]
This analysis applies with equal force here. To hold that these "follow the fortunes" clauses supplant the definition of "disaster and/or casualty" in the reinsurance treaties and allow Travelers to recover under its single allocation theory would effectively negate the phrase. The practical result of such an application would be that a reinsurance contract interpreted under New York law that contains a "follow the fortunes" clause would bind a reinsurer to indemnify a reinsured whenever it paid a claim, regardless of the contractual language defining loss.
In support of its position, Travelers relies on American Bankers Ins. Co. v Northwestern Natl. Ins. Co. (198 F3d 1332 [11th Cir]) and International Surplus Lines Ins. Co. v Certain Underwriters & Underwriting Syndicates at Lloyd's of London (868 F Supp 917 [SD Ohio]). Both cases deal with challenges by reinsurers to the reinsureds' decision to settle claims based on the terms of the underlying policies. The courts held that the reinsurers were bound by "follow the fortunes" clauses in their reinsurance agreements and, as a result, the reinsurers had to indemnify their reinsureds as long as the payments were made reasonably and in good faith. Here, by contrast, the Reinsurers are not contesting Travelers' settlement decisions based on the underlying policies; rather, the challenge is to Travelers' allocation of those settlements based on the contractual language in the reinsurance treaties. Thus, the holdings in American Bankers and International Surplus are inapposite.
Accordingly, in each case the order of the Appellate Division should be affirmed, with costs.
In each case: Order affirmed, with costs.
NOTES
[1] Travelers was known as the Aetna Casualty and Surety Company during the years underlying these lawsuits. Although the parties and the lower courts use the names interchangeably, we refer to plaintiff as Travelers.
[2] Koppers is now known as Beazer East, Inc. Since the parties and the lower courts refer to the underlying insured as Koppers, we do likewise.
[3] For ease of reference, we refer to defendants in both the Koppers and DuPont actions as "the Reinsurers."
[4] The action proceeded to trial against the remaining direct insurers, and the jury awarded Koppers $70 million. That verdict was affirmed on appeal (see, Koppers Co. v Aetna Cas. & Sur. Co., 98 F3d 1440 [3d Cir]).
[5] The Reinsurers have paid $2.86 million to Travelers, without prejudice, pursuant to certain "aggregate extension clauses" contained only in the 1960 and 1961 treaties, neither of which is at issue in this appeal. These clauses allowed Travelers to submit multiple aggregate "operations" liabilities as a single reinsurance claim. Aggregate extension clauses were not included in the subsequent treaties issued to Travelers.
[6] As an initial matter, to the extent that it is raised before this Court, we reject Travelers' contention that those defendants who were also defendants in the underlying insurance coverage litigations in their capacities as direct insurers are bound under the doctrine of informal judicial admissions by the positions they took relating to Koppers' and DuPont's waste disposal practices (see generally, Union. Indem., 89 NY2d, at 103-104). The thrust of defendants' posture in those actions was that Koppers and DuPont expected or intended the damage caused by their pollution, and thus, neither insured was entitled to coverage under the direct insurance policies (see, Koppers, 98 F3d, at 1446). This is a wholly different position from the argument the Reinsurers present here, that is, whether Travelers' single allocations are within the scope of the applicable reinsurance treaties.
[7] Travelers cites another British case, Municipal Mut. Ins. v Sea Ins. Co. (1998 Lloyd's Rep IR 421 [UK CA Mar. 26, 1998]), for the proposition that "separate underlying occurrences constitute a `series' of occurrences under [reinsurance] treaties [where] they `hav[e] a common origin or [are] traceable to the same act, omission, error and/or mistake." In contrast to the facts here, the separate acts of vandalism and theft underlying the losses at the seaport in Municipal occurred at one location over an 18-month period.
[8] We also reject Travelers' alternate contention that, even if summary judgment was properly granted as to whether the polluted sites may be aggregated as a single loss, "there are questions of fact as to whether any two or more polluted sites constitute a single reinsurance loss that exceeds Travelers['] retention" (emphasis in original). Travelers has not presented any admissible evidence demonstrating that a disputed issue of material fact exists that any two or more sites may be aggregated as a single loss under the reinsurance treaties.
[9] Commentators concur that a "follow the fortunes" clause does not supersede specific language in a reinsurance contract (see, e.g., Staring, supra, § 18:1 ["Simply stated, the reinsurer follows the insurer's fortunes under the latter's insurance policies, subject to the stated exclusions and limitations in the reinsurance agreement"] [emphasis added]; Reinsurance: Indemnifying Insurers for Insurance Losses, reprinted in Reinsurance, at 25 [Strain ed 1997] ["Following the fortunes means that, so long as the reinsured acts in good faith, its losses from underwriting that looks improvident in retrospect or was simply unlucky will be indemnified within the terms of the reinsurance contract."] [emphasis added]; 1 Russ and Segalla, Couch on Insurance § 9:22, at 9-30 [3d ed 1995] ["The extent of the liability of the reinsurer is determined by the language of the reinsurance contract, and the reinsurer cannot be held liable beyond the terms of its contract merely because the original insurer has sustained a loss."] [emphasis added]).