**TRAVELERS CASUALTY & SURETY COMPANY, f/k/a Aetna Casualty & Surety Company, Plaintiff–Appellant,**

v.

**GERLING GLOBAL REINSURANCE CORP. OF AMERICA, f/k/a Constitution Reinsurance Corporation, Defendant–Appellee.**

**Docket No. 03–9220–CV.**

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 2004.

Decided Aug. 18, 2005.

182

Mary Kay Vyskocil (Linda H. Martin and Barbara L. Seniawski, on the brief), Simpson Thacher & Bartlett LLP, New York, NY, for Plaintiff–Appellant.

Robert J. Bates, Jr., Bates & Carey LLP, Chicago, IL (Mark G. Sheridan, Bates & Carey LLP, Chicago, IL, David A. Slossberg, Hurwitz, Sagarin & Slossberg LLC, Milford, CT, on the brief), for Defendant–Appellee.

Debra J. Hall, Cynthia J. Lamar, and Matthew T. Wulf, for Amicus Curiae Reinsurance Association of America, in support of Defendant–Appellee.

Before: WALKER, Chief Judge,
POOLER and WESLEY, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

Appellant Travelers Casualty & Surety Company ("Travelers") appeals from an order of the United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge* ), granting summary judgment to appellee Gerling Global Reinsurance Corporation ("Gerling") upon Travelers' claim against Gerling for a reinsurance payment.[1] *Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp.*, 285 F.Supp.2d 200 (D.Conn.2003) ("*Travelers* "). After Travelers settled its insurance dispute with its underlying insured, Owens–Corning Fiberglas Corporation ("OCF"), it allocated the settlement amount among the OCF policies in a way that implicated its own reinsurance policies with Gerling, a reinsurer.[2] The district court concluded that because Travelers' settlement with OCF suggested that Travelers had accepted—at the time of settlement—a different allocation position from the position it asserted for reinsur-

ance purposes, Gerling was not required to honor that allocation under the "follow-the-fortunes" doctrine. *Id.* at 211–12. On appeal, Travelers argues that summary judgment in favor of Gerling contravened our recent holding in *North River Insurance Co. v. ACE American Reinsurance Co.*, 361 F.3d 134, 139 (2d Cir.2004) ("*North River II* "), which upheld the district court's grant of summary judgment to North River, the cedent, in *North River Insurance Co. v. ACE American Reinsurance Co.*, No. 00 Civ. 7993, 2002 WL 506682 (S.D.N.Y. Mar.29, 2002) ("*North River I* "). In addition, even though Travelers did not cross-move for summary judgment below, it now asks us not only to vacate the district court's order granting Gerling summary judgment, but also—in line with *North River I* and *II*—to grant summary judgment in its favor. We agree with the position advanced by Travelers, reverse the district court, and remand for entry of an order granting summary judgment to Travelers.

## BACKGROUND

I. The OCF–Travelers and Travelers–Gerling Policies

Between 1953 and 1972, OCF, the world's second-largest manufacturer of as-

---

1. During part of the relevant period, Travelers was known as The Aetna Casualty and Surety Company, and Gerling as Constitution Reinsurance Corporation. For ease of reference, we refer throughout this opinion to both entities by their current names.

2. Some general background on the insurance industry is helpful. Insurers such as Travelers provide coverage directly to an insured policy holder, such as OCF. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1198 (3d Cir.1995) ("*CIGNA* "). Insurers often offer both primary and excess coverage. Primary policies provide the initial layer of coverage. Additional layers of coverage, which insure covered claims that exceed the limits of the primary policies, are provided through excess policies. *North River Ins. Co.*

*v. ACE Am. Reinsurance Co.*, 361 F.3d 134, 137 n. 3 (2d Cir.2004). These excess policies are called upon to provide coverage only when the lower layers have been exhausted. *North River Ins. Co. v. ACE Am. Reinsurance Co.*, No. 00 Civ. 7993, 2002 WL 506682, at *1 (S.D.N.Y. Mar.29, 2002).

Insurers often obtain reinsurance on the policies—both primary and excess—that they have issued. Insurers—who are also known as "cedents" with respect to their reinsurance relationships—cede risk to reinsurers, along with a portion of the premiums. *CIGNA*, 52 F.3d at 1199. Reinsurers, such as Gerling, thus provide coverage not to the underlying insured, but rather to the insurer, or cedent. *Id.* at 1198–99.

bestos-containing products, manufactured and distributed Kaylo, an insulation product containing asbestos. OCF also installed Kaylo at numerous building sites around the country.

From 1952 through 1979, Travelers insured OCF for bodily injury and property damage through a series of annual primary policies. With respect to claims for bodily injury, the primary policies distinguished between "products" and "non-products" claims. Products coverage protected OCF from claims for asbestos-related injuries that occurred either after asbestos products were placed into the stream of commerce or after an asbestos-related operation was completed. Non-products coverage protected OCF from claims for asbestos-related injuries resulting from asbestos exposure on OCF's premises or during its business operations, for example, injuries occurring during the installation or removal of asbestos products. Each primary policy had a $1 million "per occurrence" limit of liability, regardless of whether the claims arising from that occurrence fell within the products or non-products category. Thus, for any single occurrence, Travelers was not required to pay more than $1 million under any single primary policy.

Each primary policy also had a $1 million "aggregate" limit of liability—but for products coverage only. Thus, if claims arising from multiple occurrences triggered products coverage, the most that Travelers had to pay under any single policy was $1 million. Once the aggregate limit was reached, the policy was exhausted, regardless of any additional occurrences. However, if claims arising from multiple occurrences triggered non-prod-

ucts coverage, then Travelers was exposed to unlimited liability; each occurrence was subject to a $1 million limit on liability, but there was no cap on total liability. Regardless of how much Travelers had paid for previous non-products occurrences under a single policy, each additional non-products occurrence under that policy subjected Travelers to liability anew.

During the same period, Travelers also issued to OCF a number of excess policies that provided the layer of coverage directly above the primary policies. Each excess policy included a $25 million "per occurrence" limit on liability. The combined "per occurrence" limit of all of the OCF–Travelers' policies—both primary and excess—was $273.5 million.

Although the parties disagree as to whether or not Travelers obtained reinsurance on the primary OCF policies, it is undisputed that Travelers obtained reinsurance on its excess policies from a number of reinsurers. Relevant to this litigation are five facultative reinsurance certificates [3] that Travelers purchased from Gerling covering specified portions of the excess policies Travelers had issued to OCF for the period 1975 to 1977. As is customary, those certificates contained provisions under which Gerling agreed to be bound by any loss settlements entered into by Travelers with the underlying insured, so long as they fell within the terms and conditions of the original policy and of the certificate.

## II. The OCF–Travelers Dispute

Beginning in the 1970s, asbestos manufacturers faced a crush of lawsuits for asbestos-related injuries, and OCF was no exception. Until the early 1990s, OCF

---

**3.** In facultative reinsurance, the reinsurer agrees to cover specific insurance policies. In treaty reinsurance, by contrast, the reinsurer agrees to cover all policies falling within a specified class of policies. *Unigard Sec. Ins. Co. v. North River Ins. Co.,* 4 F.3d 1049, 1054 (2d Cir.1993) *("Unigard ")*.

categorized its asbestos-related claims as falling within the products category, and as arising from a single occurrence, when submitting claims to Travelers. But by the early 1990s, Travelers had paid OCF more than $400 million, which included indemnification for one set of occurrence limits as well as defense costs, and OCF's products coverage had been exhausted. OCF then began to submit its asbestos claims as non-products claims. Travelers, however, disputed any additional coverage for these claims. In March 1993, OCF and Travelers entered into arbitration. OCF argued that (1) the claims arising from OCF's contracting operations fell under non-products coverage, and (2) each of the claims, or at least each set of claims arising from a particular job site, was a separate occurrence. Travelers responded that (1) OCF had not adequately documented its assertion that these were non-products claims, and (2) all of OCF's claims, whether products or non-products, arose from a single occurrence. Were Travelers correct as to either assertion, it would not owe OCF any additional amount, since (1) under the terms of the policies, OCF had already reached the aggregate limit on liability for products claims, and (2) Travelers had already paid one set of occurrence limits.

Prior to any final, arbitral determination, OCF and Travelers settled. Travelers agreed to pay roughly $273.5 million, which was approximately one additional occurrence limit. *Travelers*, 285 F.Supp.2d at 205. OCF and Travelers "explicitly disclaimed any particular theory of coverage," and they never reached agreement as to whether the claims arose from a single occurrence or multiple occurrences. *Id.*

III. The Travelers–Gerling Dispute

Although the settlement did not resolve the occurrence issue, Travelers had to choose an occurrence position in order to allocate the settlement among its primary and excess OCF policies. It decided to allocate most of the settlement amount as a single, additional occurrence of non-products claims, which it represented as best reflecting the OCF–Travelers compromise. Using what is commonly known in the industry as the "rising bathtub" methodology, *North River II,* 361 F.3d at 138 n. 6, Travelers allocated the settlement amount evenly among policy years. Because each year's primary policy had a $1 million per occurrence limit, the primary polices were quickly exhausted. The remaining amount was then spread among the excess policies, including those reinsured by Gerling.

In May 2001, after Gerling had refused to pay the roughly $4.4 million that Travelers billed as Gerling's share of the OCF settlement, Travelers filed the breach-of-contract suit giving rise to this appeal. Gerling's refusal to pay stemmed from its disagreement with Travelers over the allocation method; specifically, Gerling insisted that the allocation be made on a multiple-occurrence, rather than a single-occurrence, basis. *Travelers,* 285 F.Supp.2d at 206. Its reasons for doing so were obvious: given the lack of an aggregate limit on liability for non-products coverage, allocation on a multiple-occurrence basis would necessarily assign a larger portion of the settlement amount to the primary policies, and a much smaller portion to the excess policies that Gerling had reinsured. *Id.* at 207 n. 8. In October 2002, Gerling moved for summary judgment, asking the district court to find that Gerling was not required to follow Travelers' post-settlement, single-occurrence allocation. The district court granted Gerling's motion in September 2003, finding that the follow-the-fortunes doctrine did not apply. *Id.* at 210–13.

The district court's decision was based upon its understanding of the purpose of the follow-the-fortunes doctrine: [4]

> The purpose of the follow the settlements doctrine is to prevent the reinsurer from "second-guessing" the settlement decisions of the ceding company. Absent such a rule, an insurance company would be obliged to litigate coverage disputes with its insured before paying any claims, lest it first settle and pay a claim, only to risk losing the benefit of reinsurance coverage when the reinsurer raises in court the same policy defenses that the original insurer might have raised against its insured.

*Id.* at 210.

While the district court acknowledged the importance of the follow-the-fortunes doctrine, *id.*, it found it inapplicable to the Travelers–Gerling dispute in light of the positions taken by the parties as to the occurrence issue:

> Gerling[ ] . . . does not challenge Travelers' allocation by advancing a coverage position which Travelers did not press when deciding to settle . . . with OCF. Instead, Gerling's position mirrors OCF's arbitration position. [Gerling's] position . . . even if known by Travelers at the time . . . would thus not have disincentivized that settlement because it was not the position Travelers was advancing against OCF.

*Id.*

Thus, the district court construed the follow-the-fortunes doctrine as protecting the cedent, where the cedent relinquishes position A in its dispute with the original insured, who advocates position B. In such situations, the reinsurer is precluded from denying coverage on the ground that the cedent should have insisted on position A.

Although the settlement between OCF and Travelers followed this formulation in that Travelers, in order to settle, did not insist upon its initial, single-occurrence position, Travelers nevertheless allocated the claims according to the very single-occurrence position it had, according to Gerling, given up. Gerling objected to Travelers' allocating the settlement on the basis of a position that Travelers, in Gerling's view, had necessarily relinquished in the process of settling. Instead, Gerling argued, Travelers should have allocated the settlement according to the multiple-occurrence position that Gerling believed Travelers had implicitly accepted in order to settle with OCF, even though the settlement itself expressly disclaimed resolution of the occurrence issue. In denying reinsurance coverage, Gerling thus argued it was not challenging the terms of the settlement, but was rather seeking to enforce them. The district court agreed and held, in substance, that because there was no "second-guessing"˙ by Gerling, the follow-the-fortunes doctrine was inapplicable.

## DISCUSSION

On appeal, Travelers argues that the district court erred by not applying follow-the-fortunes to its post-settlement allocation. Specifically, Travelers argues that under this court's holding in *North River II,* a reinsurer is required to follow the cedent's post-settlement allocation, whether or not the allocation reflects a position initially taken by the cedent as to a particular coverage issue (here, number of occurrences) in the underlying insurance dispute. Travelers argues in addition that it is entitled not just to have summary judgment against it vacated, but to an award of summary judgment in its favor because Gerling cannot establish any other basis

---

4. The district court refers to "follow the settlements doctrine," which is the follow-the- fortunes doctrine in the settlement context. *See North River II,* 361 F.3d at 136 n. 2.

upon which to deny application of follow-the-fortunes. We review a grant of summary judgment *de novo*, "examining the evidence in the light most favorable to the non-movant and drawing all inferences in favor of it." *Id.* at 139.

## I. The Applicability of *North River*

*North River I* and *II*, on which Travelers relies in support of its claim that follow-the-fortunes should apply, overlap with this case both temporally and substantively. The appeal in that case was pending while this case was before the district court; we rendered our decision in *North River II* after summary judgment was granted to Gerling. The district court initially held Gerling's summary judgment motion in abeyance, noting that this case involved "precisely the[ ] same issues about the applicability of the follow the fortune[s] doctrine" as the *North River* litigation. J.A., at 1690–91. In the end, however, the district court granted summary judgment to Gerling some six months before we rendered *North River II*, thus acting without the benefit of our decision in that case. In any event, we believe that *North River II* is not only relevant to the case at bar, but is in fact controlling.

The *North River* litigation also involved OCF non-products asbestos claims. *North River II*, 361 F.3d at 137–38. North River had provided OCF with several layers of excess insurance, ranging from $26 million to $76 million (i.e., the layers of insurance directly above the excess Travelers policies at issue in the instant litigation). Defendant ACE provided facultative reinsurance to North River, primarily for the lowest layer of coverage, $26 to $30 million. *North River I*, 2002 WL 506682, at *1. Like Travelers, North River ultimately settled with OCF—on the same underlying non-products claims as those at issue

here—for approximately $335 million. And like Travelers, North River used the "rising bathtub" methodology to allocate the settlement amount and assumed a single occurrence for each year of coverage. *North River II*, 361 F.3d at 138. As a result, the settlement was allocated almost entirely to the layer of coverage reinsured by ACE. Like Gerling, ACE, upon receiving its bill for $49 million, disputed North River's allocation methodology. *Id.*

Specifically, ACE disputed the post-settlement allocation because it differed from the pre-settlement analysis North River had conducted, which had considered various litigation outcomes, and had identified the potential for greater risk of loss to higher policy levels not reinsured by ACE. *Id.* ACE argued "that the follow-the-fortunes doctrine *either* does not apply at all to the issue of how an insurer chooses to allocate its settlement payment among various policies *or* must at least be consistent with the theory of allocation (if discernible) that the insurer used in negotiating the settlement with its insured ...." *North River I*, 2002 WL 506682, at *2.

The district court rejected ACE's argument, noting that

> "the attempt to distinguish settlement from allocation would undermine the entire 'follow the settlements' doctrine.... [T]he determination of which among several policies covers which particular loss ... is not much different from the more general decision that the losses are covered by the policies.... Review of either type of decision has an equal likelihood of undermining settlement and fostering litigation."

*Id.* at *3 (quoting *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F.Supp.2d 49, 67–68 (D.Mass.1998) ("*Seven Provinces*"), *aff'd* 217 F.3d 33 (1st Cir. 2000)) (alteration in original omitted).

On appeal, this court affirmed.[5] Of particular relevance to the present case is the "mutuality of interest" argument raised by ACE: "ACE argues that North River's interests in allocating the loss to it are in conflict with those of ACE and thus a fundamental premise of the follow-the-settlements doctrine, *mutuality of interest*, is missing." *North River II*, 361 F.3d at 140 (emphasis added). We squarely rejected ACE's argument:

> [T]he existence of a mutuality of interest is not the only factor underlying the follow-the-settlements doctrine. In fact, the main rationale for the doctrine is to foster the goals of maximum coverage and settlement and to prevent courts, through de novo review of the cedent's decision-making process, from undermining the foundation of the cedent-reinsurer relationship.

*Id.* at 140–41 (internal quotation marks and brackets omitted). We held that

> the follow-the-[fortunes] doctrine extends to a cedent's post-settlement allocation decisions, regardless of whether an inquiry would reveal an inconsistency between that allocation and the cedent's pre-settlement assessments of risk, as long as the allocation meets the typical follow-the-[fortunes] requirements, *i.e.*, is in good faith, reasonable, and within the applicable policies.

*Id.* at 141.

The similarities between this case and *North River* are striking and ultimately decisive. Both cases involve OCF non-products asbestos claims. In both cases, post-settlement allocations were made using a single-occurrence, rising-bathtub methodology. In both cases, the reinsurer challenged that allocation methodology, which resulted in higher liability for the

reinsurer than would have resulted from an alternative methodology. And in both cases, the reinsurer's challenge was based upon the fact that the ultimate allocation differed from an earlier position allegedly taken by the cedent.

■ The one factual distinction between the cases does not alter *North River's* relevance. In *North River I* and *II*, ACE's challenge was based on the pre-settlement risk analysis conducted by North River, which differed from its post-settlement allocation position. *Id.* at 139. In this case, Gerling's challenge is based on the difference between the concession Travelers presumably made by settling with OCF (i.e., its acceptance of a multiple-occurrence position) and its post-settlement, single-occurrence allocation, which—according to Gerling—was the position it had abandoned in its settlement negotiations. *See Travelers*, 285 F.Supp.2d at 211–12. But this factual distinction does not affect the applicability of the rationale of *North River*, which is that a cedent's post-settlement allocation is subject to follow-the-fortunes, regardless of any pre-settlement position taken by the cedent, whether that position is articulated in a pre-settlement risk analysis, or implicit in the settlement with the underlying insured.

Indeed, the differences between *North River* and this case suggest, if anything, that Gerling's position is even weaker than ACE's. In *North River*, the cedent had clearly considered an alternative allocation position, as evidenced by its documented, pre-settlement analysis. *North River II*, 361 F.3d at 139. ACE thus stood on somewhat firmer ground when it claimed an inconsistency between North River's pre-settlement and post-settlement positions. Here, by contrast, it is not clear

---

**5.** We did, however, vacate and remand as to the district court's award of prejudgment in-terest under N.Y. C.P.L.R. § 5001. *North River II*, 361 F.3d at 144.

that Travelers ever accepted—as a legal matter—OCF's multiple-occurrence position. The settlement explicitly declined to resolve the occurrence issue. *Travelers,* 285 F.Supp.2d at 205. To the extent the settlement indicated any position at all as to the occurrence issue, it arguably suggested a single, additional occurrence. As the district court found, the settlement was for "roughly" one occurrence limit. *Id.* In such a case, where the cedent's earlier position as to a particular coverage issue is unclear, it is even less appropriate than it was in *North River* for the reinsurer to claim an inconsistency between that earlier position and the cedent's subsequent allocation. *Cf. Am. Employers' Ins. Co. v. Swiss Reinsurance Am. Corp.,* 413 F.3d 129, 135–36 (1st Cir.2005) (where (1) settlement between cedent and underlying insured expressly did not resolve annualization issue, (2) cedent adopted annualized approach for post-settlement allocation purposes, and (3) reinsurer argued that settlement should have been allocated on non-annualized basis, district court erred when it agreed with reinsurer).

More important than whether or not the settlement reflected a one-occurrence position, however, is the fact that a number of occurrence positions were on the table. In the OCF–Travelers dispute, OCF had advocated at least two different occurrence positions (i.e., each claimant as a separate occurrence, or, alternatively, each job site as a separate occurrence), while Travelers had advanced the alternatives of either no new occurrence or a single non-products occurrence. That all of these possibilities as to the occurrence issue were subsumed by the settlement only serves to underscore the relevance of *North River.* As the district court in *North River I* noted,

> [w]henever settlements are made in cases involving multiple policies and multiple insurers and reinsurers, numerous good faith methods of allocation will

be available and under consideration, but only one will ultimately be chosen .... To allow reinsurers to second-guess that allocation would be to make settlement impossible and reinsurance itself problematic.

*North River I,* 2002 WL 506682, at *3.

In short, we decline to authorize an inquiry into the propriety of a cedent's method of allocating a settlement if the settlement itself was in good faith, reasonable, and within the terms of the policies. *See North River II,* 361 F.3d at 141. *See also Am. Employers' Ins. Co.,* 413 F.3d at 136 (where settlement between cedent and underlying insured was unclear as to annualization issue, and where cedent's post-settlement approach was "ground[ed] in the settlement process itself," the reinsurer was required—"absent a clear limitation in the [reinsurance] certificate"—to "follow the gloss (assuming it is reasonable and made in good faith) given to the underlying policies" by the cedent). Given that Travelers and OCF expressly declined to resolve the occurrence issue, there is no cause for us to do so now. Indeed, were we to undertake such an analysis, we would be engaging in precisely the kind of "intrusive factual inquiry" that the follow-the-fortunes doctrine is meant to avoid. *North River II,* 361 F.3d at 141. Judicial review of either the settlement decision or the allocation decision "has an equal likelihood of undermining settlement and fostering litigation." *Seven Provinces,* 9 F.Supp.2d at 68.

Gerling attempts to deflect our attention from *North River* by raising a choice-of-law argument and directing us to the New York case of *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London,* 96 N.Y.2d 583, 734 N.Y.S.2d 531, 760 N.E.2d 319 (2001) (*"Lloyd's"*). *Lloyd's,* Gerling says, stands for the proposition

190 

that follow-the-fortunes does not apply to post-settlement decisions. *Lloyd's*, however, is inapposite. *Lloyd's* involved reinsurance treaties rather than facultative certificates, *id.* at 587, 734 N.Y.S.2d 531, 760 N.E.2d 319, and those treaties contained their own definitions of "loss" and "disaster," which were distinct from the coverage terms of the underlying insurance policies, *id.* at 589, 734 N.Y.S.2d 531, 760 N.E.2d 319. The *Lloyd's* treaties, in other words, were distinguishable from Gerling's reinsurance certificates, which did not contain an independent definition of "occurrence." The Court of Appeals in *Lloyd's* held that follow-the-fortunes did not apply to the cedent's post-settlement allocation because the allocation did not fall reasonably within the treaties' definition of "disaster." *Id.* at 595, 734 N.Y.S.2d 531, 760 N.E.2d 319. That holding has no bearing here. The district court never held that Travelers' allocation violated the terms of either OCF's underlying policies or the facultative certificates issued by Gerling to cover those policies.

■ In sum, we find *North River* to be directly applicable to the case at bar. We therefore reject the district court's conclusion that Travelers' and Gerling's failure to agree on the occurrence issue barred application of follow-the-fortunes, and reiterate that follow-the-fortunes "extends to a cedent's post-settlement allocation decisions . . . as long as the allocation meets the typical follow-the-fortunes requirements, *i.e.*, is in good faith, reasonable, and within the applicable policies." *North River II*, 361 F.3d at 141.

## II. Travelers' Summary Judgment Request

In light of *North River*, we cannot agree with the district court that follow-the-fortunes was—as a matter of law—inapplicable to Travelers' claims. Gerling—no doubt recognizing the likely implications of *North River* for its post-settlement allocation argument—argues in the alternative that follow-the-fortunes should not apply, and summary judgment should be affirmed, because Travelers submitted its reinsurance claims to Gerling in bad faith. Even if the district court's grant of summary judgment cannot be affirmed on bad-faith grounds, Gerling contends, the case should at least be remanded for further proceedings. Travelers, for its part, argues not only that summary judgment cannot be affirmed on alternative grounds, but also maintains that remand is unnecessary because Travelers is itself entitled to summary judgment. Specifically, Travelers contends that no genuine issue of material fact exists precluding application of follow-the-fortunes and that, under that doctrine, it is entitled to judgment as a matter of law, even though it did not cross-move for summary judgment below.

■ If, on the record before us, we agree that Gerling cannot establish any material issue of fact requiring further proceedings, it is clearly within our authority to grant Travelers summary judgment. *See, e.g., Potenze v. New York Shipping Ass'n*, 804 F.2d 235, 239 (2d Cir.1986); *Abrams v. Occidental Petroleum Corp.*, 450 F.2d 157, 165–66 (1971), *aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). As with a *sua sponte* grant of summary judgment in favor of a non-movant, we must, of course, ensure that each side "has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir.1999). Summary judgment in favor of the non-movant can be particularly appropriate where, as here, the factual record has been "fully devel-

oped."[6]  *Coach Leatherware Co. v. Ann-Taylor, Inc.,* 933 F.2d 162, 167 (2d Cir. 1991).  We therefore consider first whether Gerling's allegations of bad faith can support the district court's grant of summary judgment, or may at least preclude Travelers from seeking summary judgment at this stage.  Because we conclude that Gerling is unable to raise a triable issue of material fact as to bad faith, we then consider whether any other genuine issue of fact might prevent us from applying follow-the-fortunes in this case.

### A.  Gerling's Bad Faith Argument

■  Follow-the-fortunes applies only to claims submitted in good faith.  *See, e.g., North River II,* 361 F.3d at 141.  A reinsurer who seeks to avoid application of follow-the-fortunes by claiming bad faith, however, must make an *"extraordinary* showing of a disingenuous or dishonest failure . . . ." *CIGNA,* 52 F.3d at 1216 (emphasis added).  Gerling relies primarily on two arguments in support of its contention that Travelers submitted its reinsurance claims in bad faith.  First, Gerling contends that the allocation of all non-products claims to a single occurrence was inconsistent with the definition of "occurrence" in the underlying policies and rested on a construction of that term that is so legally baseless that it has never been adopted by any court in any jurisdiction.  Second, Gerling contends that because Travelers had not reinsured its primary policies (a contention that Travelers disputes), it sought to shift its settlement loss from the primary to the excess policies, so as to maximize its reinsurance recovery.

■  The former argument may be rejected insofar as allocation on a legally novel theory does not itself constitute evidence of dishonesty or disingenuousness.  But we note that this argument of Gerling's is really a challenge under the exception to follow-the-fortunes that allows a reinsurer to challenge a cedent's construction of underlying policy terms as unreasonable, and is therefore addressed in the discussion of this exception, *infra.*  Regarding the latter argument, Gerling maintains that Travelers' allocation of the settlement in a manner aimed at maximizing reinsurance recovery constituted bad faith.  As a result, Gerling asserts, the excess policies that it reinsured, which otherwise would have faced "virtually no exposure," Appellee's Br., at 42, were allocated the bulk of the settlement amount.

Our review of the record, however, reveals that bad faith cannot provide an alternative basis upon which to sustain the district court's grant of summary judgment to Gerling.  Indeed, because Travelers now seeks summary judgment in *its* favor, we ask whether Gerling has raised any genuine issue of material fact as to Travelers' good faith that might prevent us from applying follow-the-fortunes at this stage.  We conclude that it has not.

Specifically, Gerling cannot substantiate its claim that had a multiple-occurrence allocation method been used, it would have faced "virtually no exposure" because only the primary policies would have been implicated.  As the district court recognized, "the record provides no basis for determining if the adoption of OCF's position would have led to an allocation of greater than one million dollars to any one occurrence

---

6.  At oral argument, Travelers' counsel informed the court that discovery has concluded.  Gerling's counsel took no contrary position. *Cf. Abrams,* 450 F.2d at 166 (granting summary judgment in favor of non-movant where "[a]ppellees' brief contains nothing to suggest" that summary judgment should not be granted to non-movant "if [the court] should determine to reverse, and inquiry at the argument failed to reveal any new facts that might be adduced by [appellees] at an evidentiary hearing").

and thus potentially triggered liability under some of the excess policies at issue in the present case." *Travelers*, 285 F.Supp.2d at 209. In other words, even if—as OCF had contended and Gerling now urges—each claimant were deemed a separate occurrence, if any individual claimant had been awarded a large sum (i.e., more than $1 million), that claim would have spilled into the excess layers of coverage, and Gerling's certificates—which corresponded to the lowest layer of excess coverage—would have been implicated. The same is true, and even more likely, under the alternative occurrence position Gerling advocates, where each job site would be considered a separate occurrence.

Gerling's assertion that Travelers failed to reinsure its primary policies—another key premise underlying its bad-faith story—is likewise unsupported. The primary evidence Gerling offers—the statement of a former OCF employee that Travelers' "excess policies, unlike its primary policies, were and are routinely reinsured," J.A., at 892 ¶ 11—says nothing about the specific primary policies at issue in this case. In addition, Travelers directly disputes Gerling and asserts that its primary policies were covered by treaty reinsurance.[7]

Gerling also cites evidence indicating that the Travelers employee in charge of allocating the OCF settlement, Tim Walker, was aware that the policies at issue were reinsured, but is unable to refute Walker's testimony that he did not know who had reinsured which policies, or how his allocation methodology would impact reinsurance recovery. Moreover, the email from Walker to other Travelers employees to which Gerling gives such weight in no way indicates that Walker's allocation was based solely, or at all, on reinsurance maximization; rather, it indicates only that Walker wanted to prepare an exhibit on the allocation of the settlement and to notify Travelers' reinsurers of the allocation as soon as possible. J.A., at 623. That Walker was aware that the OCF policies were reinsured does not evidence a bad-faith intent to maximize reinsurance recovery by allocating on a single-occurrence basis. *See Unigard*, 4 F.3d at 1069 (rejecting simple negligence standard and requiring, at a minimum, that bad-faith be demonstrated by culpability amounting to gross negligence or recklessness).

Indeed, we note that it would likely be even more difficult for a reinsurer to prove a cedent's bad faith in the present context (i.e., where a cedent allegedly attempted to maximize reinsurance recovery through a post-settlement allocation) than in the typical reinsurance dispute. Cases in which reinsurers allege bad faith usually involve a cedent's alleged failure to notify the reinsurer of coverage changes, as required in the reinsurance certificate, *see, e.g., Unigard*, 4 F.3d at 1069, or a cedent's decision to settle with the underlying insured, *see, e.g., Seven Provinces*, 9 F.Supp.2d at 66–67.[8] Here, Gerling's com-

---

7. In its Reply Brief and at oral argument, counsel for Travelers informed the court that proof of Travelers' reinsurance of its primary policies was absent from the record on appeal because Gerling raised this argument for the first time on appeal, after the close of discovery.

8. The only case cited by Gerling that discusses bad faith in the allocation context is *Hartford Accident & Indemnity Co. v. Columbia*

*Casualty Co.*, 98 F.Supp.2d 251 (D.Conn. 2000). But in that case, the cedent was accused of structuring the settlement with the underlying insured so as to maximize reinsurance recovery. *Id.* at 259. *Hartford* is thus distinguishable from the present case, in which Gerling raises no complaints about the OCF settlement itself, but rather alleges that a good-faith settlement has been tainted by a bad-faith, post-settlement allocation. Not even Gerling contends that Travelers some-

plaint is not that Travelers failed to notify it of material facts, or even that Travelers' settlement with OCF was somehow improper. Instead, Gerling complains that—after entering into a settlement in which the occurrence issue was deliberately left unresolved and to which Gerling had no objections—Travelers, when faced with multiple potential allocations of the settlement amount, chose an allocation that evinced bad faith. Reinsurers raising such claims will generally face a very heavy burden; a cedent choosing among several reasonable allocation possibilities is surely not required to choose the allocation that *minimizes* its reinsurance recovery to avoid a finding of bad faith. *See Am. Employers' Ins. Co.*, 413 F.3d at 136 (observing that, while some concern exists as to a cedent's incentive to allocate settlements with a view to reinsurance recovery, "there is no law that says that insurer and reinsurer interests have to be perfectly aligned to trigger a follow-the-settlement clause"). An allocation that increases reinsurance recovery—when made in the aftermath of a legitimate settlement and when chosen from multiple possible allocations—would rarely demonstrate bad faith in and of itself. In any event, we need not determine when a post-settlement allocation is no longer a reasonable business decision and instead becomes a decision made in bad faith because Gerling has

failed to demonstrate anything approaching the requisite intent on the part of Travelers. Accordingly, Gerling's bad-faith allegations are too insubstantial to sustain the district court's grant of summary judgment, or even to raise a triable issue of fact requiring further proceedings.[9]

### B. *The Terms of the Policies*

▆▆▆ Having concluded that Gerling is not entitled to summary judgment or even to remand either based on the district court's post-settlement allocation theory or based on Gerling's bad-faith allegations, we next consider whether there are any other grounds for refusing Travelers' request that we apply follow-the-fortunes at this time. We therefore turn to a potential argument against application of that doctrine—raised by Gerling in the district court, but not renewed on appeal: that Travelers' allocation did not fall within the terms of the policies. It is well-established and not at all surprising that follow-the-fortunes does not require indemnification for losses not covered by the underlying policies. *See Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 912 (2d Cir.1990) (noting that follow-the-fortunes only "burdens the reinsurer with those risks [covered by] the direct insurer's policy covering the original insured"). Thus, "the reinsurer retains the right to

how arranged its settlement with OCF so as to maximize its reinsurance recovery.

9. In this regard, this case is distinguishable from *American Employers' Insurance Co.* and *Commercial Union Insurance Co. v. Swiss Reinsurance Am. Corp.*, 413 F.3d 121 (1st Cir. 2005), which held that the district courts had erred in ruling that the reinsurer was not required to follow the cedent's post-settlement allocation approach, but vacated and remanded for further proceedings. The First Circuit remanded in those cases because questions of fact remained as to the reasonableness of the post-settlement allocations and the cedents'

good faith. *See Commercial Union Ins. Co.*, 413 F.3d at 128, 129 (noting that settlement was "seemingly reasonable … so far as we know," and that it was unclear whether "good faith is at issue"); *Am. Employers' Ins. Co.*, 413 F.3d at 137 (noting that reinsurer was "free on remand to challenge reasonableness and good faith"). In the case before us, discovery has concluded and the record is closed. Because our review reveals no triable issue of fact as to good faith or reasonableness, *see* discussion *infra*, remand is unnecessary.

question whether the reinsured's liability stems from an unreinsured loss." *CIGNA*, 52 F.3d at 1199–1200. A loss is unreinsured "if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance." *Id.* at 1200. Were the record to indicate that the losses occasioning Travelers' claim against Gerling were not covered by the OCF–Travelers policies, we might conclude that follow-the-fortunes did not apply, or at least that further proceedings on the issue were necessary. The record, however, demonstrates the opposite.

▮ Disputes between a cedent and a reinsurer frequently arise when a reinsurer refuses to indemnify a cedent on the ground that the underlying claim was not covered by the underlying insured's policy. No such dispute is involved here. Gerling agrees that non-products asbestos claims fell within the coverage provided by Travelers to OCF, and, derivatively, within the certificates issued to Travelers by Gerling. What Gerling finds objectionable is Travelers' single-occurrence methodology. We have difficulty understanding how Travelers' allocation of a loss that concededly falls within the policies could nevertheless violate the terms of those policies. If Travelers had allocated the loss to an entirely unrelated set of policies, for instance, policies providing dental insurance, then Gerling could understandably argue that the allocation violated the terms of those policies. But Travelers simply allocated the settlement loss to the policies that covered that loss, using one of several possible allocation methods. A reinsurer undoubtedly "cannot be held accountable for any *loss* not covered by the reinsurance policy," *North River II*, 361 F.3d at 141 (emphasis added), but if a loss is covered by several policies, a good-faith, reasonable allocation among those policies cannot

violate their terms. We therefore reject any suggestion that Travelers' allocation of the settlement fell outside the policies' terms.

## C. *Reasonableness*

▮ Finally, in order to trigger the deference due under follow-the-fortunes, a settlement must be reasonable, *see Am. Employers' Ins. Co.*, 413 F.3d at 136–37, a standard that we applied to post-settlement allocations in *North River II*, *see* 361 F.3d at 139. Travelers asserts that its post-settlement allocation was unquestionably reasonable, and we agree.

First, it is undisputed that until the early 1990s, when this controversy arose, OCF had consistently submitted its asbestos claims to Travelers—and Travelers had paid them—on a single-occurrence basis. Only when OCF's products liability coverage was exhausted did OCF argue that its claims actually arose out of multiple occurrences falling under its non-products coverage. In light of this history, it was reasonable for Travelers to adopt a single-occurrence position, both in its negotiations with OCF and, ultimately, in its allocation of the settlement.

Second, Travelers' allocation method was reasonable when viewed in the context of then-prevailing case law. The settlement was concluded in 1995, and Travelers had allocated the settlement by January of 1996, although it did not notify its reinsurers of the allocation until November of 1996. The relevant period was therefore late 1995. At that time, numerous courts—including courts applying Ohio law, which governed OCF's policies, and construing OCF policies—had treated asbestos-related bodily injury claims as arising out a single "occurrence." *See, e.g., Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London*, 868 F.Supp. 917, 919

(S.D.Ohio 1994) (observing that OCF "took the position that the [approximately 85,000 personal injury] asbestos claims against it arose from one occurrence," in context of OCF policy with ISLIC, which contained definition of "occurrence" virtually identical to the definition contained in OCF's Travelers' policies); *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 762 F.Supp. 566, 595 (S.D.N.Y.1991), *aff'd in part and rev'd in part on other grounds*, 4 F.3d 1049 (2d Cir.1993) (observing that under Ohio law, all asbestos claims would be treated as single occurrence). The only pre–1996 case cited by Gerling in support of its multiple-occurrence position was decided by this court on December 13, 1995. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1212–14 (2d Cir.1995). We are unwilling to find, based on a single decision issued one month before Travelers completed its allocation, that Travelers' one-occurrence methodology, which was otherwise fully consistent with existing case law and with OCF and Travelers' past dealings, was unreasonable.[10]

██ Because Travelers' post-settlement allocation was made in good faith and was reasonable, and because we discern no other material factual dispute that might preclude application of follow-the-fortunes to Travelers' reinsurance claim, we conclude that the doctrine applies. Under follow-the-fortunes, we ask only "whether there is any reasonable basis" supporting the cedent's claims. *CIGNA*, 52 F.3d at 1206. Having already concluded that Travelers' post-settlement allocation was reasonable, we find that it easily meets this deferential standard of review. We therefore hold that Gerling is required to indemnify Travelers for that portion of the OCF settlement—as allocated by Travelers—covered by Gerling's reinsurance certificates.

## CONCLUSION

For the foregoing reasons, we hold that Travelers is entitled to summary judgment as a matter of law. The judgment of the district court is REVERSED and REMANDED for entry of an order granting summary judgment in favor of appellant.

---

**10.** We note in addition that *Stonewall* dealt with the definition of "occurrence" under New York and Texas case law, not Ohio law, which governed OCF's policies. *See Stone-* *wall Ins. Co.*, 73 F.3d at 1213. Its relevance, if any, would thus have been even less apparent to Travelers.